Okay, you may proceed. Farewell, Mr. Koppel. You may proceed when you're ready. Thank you, Your Honor. May it please the court. I'm with the Department of Justice, and I'm The district court erroneously held that the United States has an Indian trust law duty rooted in the Fort Laramie Treaty of 1868 to provide what the district court characterized as competent physician-led health care to the courts. The court failed to recognize the requirements of Indian trust law, which demand first the existence of a trust corpus, which is not satisfied in this case, and second, also a specific body of rights creating prescriptions, which also does not exist in this case. Um, the treaty simply required the United States to provide a single physician and a house for that physician not to exceed the cost of $3,000 and annual appropriations for that physician, as well as several other service providers to the entire Sioux Nation. And that obligation has been thoroughly fulfilled by the United States to the present day. First, through the treaty, its compliance with the treaty terms itself, and subsequently, after the federal government enacted the Snyder Act and the Indian Health Care Improvement Act through the Indian Health Service, which provides health services to the entire American Indian and Alaska Native community in excess of $2 billion a year with more than 600 hospitals and clinics and thousands of doctors and other medical care providers. So, it is clear, particularly under this court's decision in the Yankton Sioux case, that there is no trust corpus here, which is a requirement of the Indian trust law doctrine. The trust corpus would consist of... Now, so I wanted to ask you about the Yankton Sioux. I mean, Yankton Sioux does talk about a trust corpus, but in the very next sentence, it says, nor has Yankton Sioux alleged violation of any statutory or treaty obligation that could be characterized as a breach of trust. Doesn't that mean you can either have a trust corpus in some situations, or you can have a trust obligation that flows from a treaty? And don't we have the latter arguably here? Well, Your Honor, certainly. We read those two requirements as being in conjunction, that both requirements have to be met. There has to be a trust corpus, as well as the rights-creating body of law, and that's why the court used the term nor as the connector. But to the extent that certainly a treaty can give rise to obligations, and in theory, a treaty can also give rise to trust obligations. But would you agree that there's a general trust obligation toward the tribes that the federal government owes? Your Honor, there is a general trust law obligation, but again, that is different from a common law trust obligation, which is what the plaintiffs are suing under and what the Supreme Court's and this court's cases over the last 40 years since the Mitchell cases have really have addressed and developed. It's clear that for a common law trust obligation to exist, there does have to be a trust corpus. It's not enough that it be a limited or bare trust, as the Supreme Court and this court have repeatedly characterized, that there must be assets, there must be Indian property that is being managed by the Indians. Then in addition to that, there also has to be a rights-creating body of law, be it statutory, regulatory or treaty. Now here, neither of the requirements of trust law are satisfied, because first, there's no trust corpus. And in that respect, again, I would turn it to Yank and Sue, which is very revealing, because that case also involved a Sioux tribe, which was a signatory to this treaty, and it involved the closure of an emergency room, as this one did. And there, the court held that neither of the prongs of trust doctrine had been satisfied. So, that is the, that's the, there is also the additional problem with the District Court's declaratory judgment, which is an advisory opinion, but the court need not address that, if it agrees with the government that the requirements of Indian trust law are not satisfied here. So, unless there are further questions at this point, I would reserve the balance of my time for rebuttal. Well, I do have one. If you look at the language that was used in the Yank and Sue tribe case, one of the things that is apparent in that language is that the could be characterized as a breach of trust or a fiduciary duty. And here, obviously, that is specifically alleged. Does the allegation make any difference at all in your analysis? Well, no, Your Honor, it doesn't, because the treaty clearly does not give rise to a trust obligation under the terms of the relevant and controlling Supreme Court and Eighth Circuit precedent. It's just, there was a treaty, there is a treaty obligation, which was very specific, and it was fully satisfied by the United States, as I stated initially, by complying with those specific terms, and subsequently by creating a vast Indian health care system, which encompasses the Rosebud Sioux tribe and the entire Sioux Nation, as well as the Sioux Nation. So the trust obligation here simply does not, it cannot give rise to a, the treaty obligation cannot give rise to a trust law duty as that has been defined in the applicable case law. So again, unless there are further questions, I would, I would reserve the balance of my time. All right, very well. Mr. Billion. Thank you, Your Honor, and good morning. For the record, my name is Tim Billion from Robbins Kaplan, arguing on behalf of the Rosebud Sioux tribe. In 1868, the Rosebud Sioux tribe, along with other tribes, entered into the Treaty of Fort Laramie with the United States. Along with a cessation of hostilities, the United States acquired vast territories of land in that treaty. And in exchange, the United States made a number of promises, including the promise of issue in this case. I'm not going to spend my time today rehashing the tragic state of health care on the Rosebud Reservation. I think the three-volume appendix here thoroughly documents those facts, and indeed, much of that evidence comes from the federal government itself. Instead, this case has focused on three narrow legal issues the government has offered to avoid its treaty and statutory promise, and we heard my colleague talk primarily about one, the trust corpus issue. There's also the scope of the treaty duty and the issue of redressability. I'll go through each of those, but ultimately, I think each issue comes back to the same central theme. A party to a treaty with the federal government can get a declaration of its rights in federal court. Turning first to the trust corpus issue, you know, Judge Erickson and Judge Kobus, you both brought up language in the Yankton Sioux decision that I think is very important and telling. That case primarily involved whether the government complied with certain statutory consultation obligations prior to changing services. It changed an emergency department to an urgent care clinic. That's not what we have here, and furthermore, the primary basis for the holding in Yankton Sioux was preclusion. That's also not an issue here. The only extent to which the court in Yankton Sioux addressed the trust or treaty issue was in the very final paragraph of that opinion, and the court simply noted that the tribe hadn't alleged a specific violation and that its vague assertions were not actionable. But I believe, as Judge Erickson, as you noted, by contrast here, we have alleged specific treaty and statutory violations, and as Judge Kobus picked up on, the opinion distinguishes between trust obligations, where the government manages resources and where you may need a trust corpus, and then a violation of a statutory or treaty obligation. That's at page 644 of the opinion, and all of that supports the idea that a trust duty can and often does exist where it's created by a treaty or by a statute, and that's separate and independent from the existence of any resources managed by the government. There's no reason to read those requirements conjunctively. I would point the court especially to the White v. Califano case, where the court there did find a statutory trust duty based on the same statutes that are at issue here, and it didn't look to a trust corpus issue. It just looked to the statutes. So I think that's really instructive as to the point that these are not conjunctive duties. And this, furthermore, it's not a bare trust like was at issue in Mitchell, where the government was simply managing timber resources to prevent their alienation. Here we have affirmative commitments both in the treaty and in numerous subsequent statutes that provide obligations to provide health care. I'd like to talk next a little bit about standing and redressability. At its core, there's nothing unusual about this lawsuit. Parties ask for courts to interpret documents all the time, you know, insurance contracts or statutes or treaties, and courts then define the rights and responsibilities of the parties, and that can even be done prospectively before a breach occurs. The district court's opinion here was not an advisory opinion simply because it very well documented and very tragic. I point the court to Joint Appendix at page 773 for just one among many examples. I'm going to quote, "...the impacts of these deficiencies are not theoretical. These persistent failures have led to unnecessary suffering by patients, by families, and by whole communities. In fact, they have led to multiple patient deaths." Again, that's just one example from the undisputed evidence, and that comes from the federal government itself. So this lawsuit is not an advisory opinion about events that may hypothetically occur in the future. It's about what already happened. The care the government was providing at the Rosebud Hospital was so poor that it constituted an immediate danger to patients in the public and resulted in the facility being shut down. I would also point out that the relief granted here is sufficiently specific and conclusive to redress the treaty interpretation issue. The district court here didn't need to solve every problem with IHS or micromanage its budget. It needed to construe the treaty, and its decision is authoritative and conclusive as to what the treaty requires. Here I would point the court to page 560 in the White v. Califano opinion, where it says, "...a declaratory judgment will serve the vital purpose of defining rights and responsibilities in the area of Indian health care." And that's exactly what we need here. The district court's judgment has real meaning. Simply the confirmation that health care is not a gratuitous appropriation that's benevolently conferred upon the tribe, but it's instead a treaty right given in exchange for peace and land, that's momentous. And this declaration, it won't solve every problem with IHS, but it will directly and conclusively solve one major harm, the harm that the government doesn't recognize that it has a treaty obligation to provide adequate health care to the tribe. And judicial confirmation of that right allows the tribe to hold political actors accountable when they fail to live up to those promises. I do want to talk in my remaining time about the scope of the treaty obligation, and I'll start by observing that the district court properly recognized the liberal canons of construction that favor the tribe. Treaties are construed in favor of the tribes, and the terms are interpreted as the Indians would have understood them themselves. So here, the treaty required the government to provide a physician, provide a house for the physician, and provide sufficient funds annually to employ the physician. So when we look at the language of the treaty itself, providing the annual employment of the physician means committing to provide care. And it's reasonable for the district court to infer the Indians signing the treaty would have understood that care from a physician be competent. I would also note, as the district court noted in footnote two of its opinion, and again referenced in footnote 10 of its opinion, that when you look at the treaty itself, the tribal signatories signed their name with an X. They couldn't read English, and this treaty was written down in English. That's precisely one of the reasons that courts apply the liberal canons of construction in favor of tribes. Counselor, I mean, the text of the treaty still has a physician. It's singular. And there are other instances where, I forget if there are multiple blacksmiths, but certainly teachers, the treaty specifically contemplates more than one. I mean, isn't that just on the face of the treaty a difference? And jumping to, I mean, it may be that a competent physician can be implied from the treaty, but competent health care seems to me to be a different sort of a leap as opposed to the one that you've, that, well, in my view, potentially different than the conclusion the district court reached here. Yes, and the court's right that the treaty talks about multiple teachers. And then there were other singulars, I believe a blacksmith and a miller and the physician. Education was treated as a separate subject in this treaty. There were actually a number of different sections talking about when you needed to expand and provide more teachers, how, for example, the United States could withdraw a physician after 10 years, but had to provide additional funding for education and health care, that there's not a direct parallel there that the court can use to so limit the health care obligation. But how about the other obligations? For example, I think there's a miller that was required to be provided. Under the district court's interpretation of the treaty, is there an ongoing trust obligation or treaty obligation under the government, for example, to provide grain production facilities for the tribe? Doesn't the same logic, understandably health care is a critical need, but under the interpretation of the treaty, why doesn't that fly too? Why doesn't the trust obligation extend to the other professionals? I think the best answer to that question, Your Honor, is because, first of all, there's been no evidence that the government withdrew from health care as it could have under the treaty. It didn't do that. The district court specifically noted that. I don't know whether the federal government has specifically withdrawn the miller or specifically withdrawn the blacksmith. That was never presented to the district court. So we just don't have that information in the record. So do I think that we could declare those duties also extended? On this record, no, we couldn't. But the key difference with health care is that not only is it in this treaty from 1868, but it's subsequently recognized in statute after statute after statute and not just to provide a single physician, but to provide health care. Doesn't that indicate simply that the government went beyond its treaty obligations? And doesn't the linking case suggest that those sorts of general statutes cannot impose trust or treaty obligations on the federal government? No, Your Honor, I would frame it a little differently. I would argue that the Congress of the United States has taken a much different position. And we've seen that in report after report after report and study after study and hearing after hearing where Congress has reaffirmed its obligation to provide this health care. And I would also point out, Your Honor, that... Well, hold on a minute. I mean, if you think about what that means, is that that's got to mean that somehow there's a treaty obligation plus. And that plus has to come from, you know, probably its origins would be in the subsequent Indian Health Act, right? And we're going to run right smack up into the reasoning of what the Ninth Circuit said, that those don't create an enforceable trust obligation at that point, right? I mean, and so the question I've got is that how do we move beyond plain meaning of the treaty language itself to find some other obligation that's broader, right? That the obligation that the district court found here, physician-led competent health care, right? How do you get there? And I'm just... That's why, you know, as I struggle with the analysis, that's the piece I'm looking at, because I'm thinking that, you know, you can look at the Snyder Act, you can look at the Indian Health Service as it's been managed and run, but we have a case law that's floating around out there that says that those are not sufficient to find an obligation. So your obligation has to reside somewhere in the Fort Laramie Treaty, and how do you move beyond plain language? Sure. Well, I think that, you know, the court's question leads me to what my next point was going to be, which is that there's the treaty, and the treaty exists and provides, you know, an obligation, right? There is an obligation there, whatever it may be. There's also a series of statutes, the Snyder Act, the Indian Health Care Improvement Act, and later the Affordable Care Act, and those statutes, I actually, I do believe those create an independent duty, and I think that that's the holding that comes out of the White v. Califano case. Now, I assume, Judge Erickson, your question about the Ninth Circuit was relating to the Ketchum decision, if I'm saying that correctly, and, you know, Your Honor, that was an unpublished, single-page decision where the court rejected a fiduciary duty claim based solely on the acts, and I think it's distinguishable here for a number of reasons. First, we do have a treaty, and those treaties, the interpretation of that treaty, rather, is informed by the subsequent passage of the statutes that evidence Congress's understanding of its obligation to provide health care that first arose in the treaty, and finally, I would say, Your Honor, to the extent that the Ninth Circuit decision conflicts with White, this court needs to follow White v. Califano, which is, you know, ultimately was an Eighth Circuit decision where the Eighth Circuit adopted the reasoning of the District Court and found that those same statutes, the Snyder Act and the Indian Health Care Improvement Act, did create a trust responsibility. So, hearing no further questions, I've run under a minute here on my time, so I will just briefly conclude. The federal government made promises to the tribe, and the tribe is entitled to have the federal court construe and declare the rights and obligations of the parties of the treaty, and if the federal government's trust responsibilities can't be adjudicated in a federal court, then where? Thank you. All right. Thank you, Mr. Billion. Mr. Koppel, your rebuttal. Thank you, Your Honor. I don't have a great deal to add to the points that were made by Judges Cobas and Erickson. I would emphasize that what the plaintiff is trying to do here is to graft onto very specific treaty obligations a broad and vague Indian trust law duty that simply does not exist. The Indian canon is not applicable here because the parties would not have understood it, neither the United States nor the Sioux tribes would have understood it to involve a health care system, which the term health care is not even used in the treaty. It simply refers to a physician, and the additional statutory obligations in the Snyder Act and the Indian Health Care Improvement Act are simply broad and aspirational statements, as the district court recognized, and they do not give rise to a trust law duty. The district court even recognized that it was just gave rise to this trust law duty. So the plaintiff's reliance on White versus Califano is misplaced because, as we showed in our briefs, White is really, at this point, whatever its status as good law, it is certainly inconsistent with the last 40 years of decisions from the Supreme Court and also decisions from this court in cases like Yankton Sioux and Ashley, which make clear that that is not the mode of analysis that should be employed in the Indian trust law area. So, again, and as for the, it's also significant that the treaty involved other service providers such as millers, blacksmiths, teachers, etc. So to say that, to extrapolate from the language providing a physician and a physician's house and appropriations, annual appropriations for a physician to provide services, that somehow creates a broad duty to provide healthcare, a healthcare system, which is what is really what the plaintiffs and the district court are driving at simply is not valid. Is it the position of the United States then that, looking solely at the treaty, just assume for a minute that we take an approach, we're going to take an approach of looking at obligations under the treaty, is it the position of the United States that its obligation under the treaty in 2021 is to provide one physician and a house at a cost of not to exceed $3,000? Well, your honor, certainly the United States is providing infinitely more than that through the statutory discretionary statutory programs, but those fully satisfy any obligation created by the treaty. The treaty, of course, by its terms, which is as the parties understood in 1868, and that is the relevant time, required only a single physician and the physician's house and appropriations for the entire Sioux nation. There can be no doubt that the United States is fully satisfying the requirements of the treaty now as it has all along through the vast Indian healthcare network that Congress has provided. Now, if Congress were to revoke that and to eliminate the Indian health service, then perhaps plaintiffs could bring a claim if they're not receiving any medical services but that obviously is a far cry from what has happened here. What the plaintiffs are doing is saying that because they are dissatisfied with services at the Rosebud Hospital, the United States has violated a duty under Indian trust law that can be enforced through a very vague and abstract declaratory judgment and it doesn't resolve any specific concrete dispute between the parties. This is just an open-ended claim to create an obligation, a permanent obligation, under the treaty to provide a general healthcare system and that's not what the treaty did. So if there are no further questions, I would urge the court to reverse the judgment of the district court. All right, thank you, counsel. The case is submitted. The court will render a decision in due course.